UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SAMUEL BROWNRIDGE,

                           Plaintiff,

       -against

THE CITY OF NEW YORK and
DETECTIVE RAY MEDINA

                      Defendants.

**COMPLAINT**

Docket:  21-CV-4603

JURY TRIAL DEMANDED

**"It is … no surprise that large segments of our city and our country have grave doubts about the criminal justice system and its ability to deliver equal and fair justice to all.  Cases like yours, Mr. Brownridge … demonstrate that their anger is justified and their anger is legitimate."**

**-Hon. Joseph A. Zayas, New York State Supreme Court (dismissing charges)**

1

## INTRODUCTION

1.      In March of 1994, Samuel Brownridge was only 19 years old, working to provide for his young son and fiancée, while taking classes to complete his GED to forge a brighter future for his new family.  Though in a high-crime neighborhood, he lived with his parents and sister in a nurturing home, had no criminal history of violence or gun possession, and had never gone to prison.  But on March 14, 1994, after Sam walked his three-year old son to daycare, his life changed forever.  Targeted by Ray Medina, a corrupt detective who manufactured probable cause that he knew did not exist, and who then orchestrated Sam's identification in a suggestive lineup, Sam was arrested for the murder of a man whom he had never met. That man, Darryle Adams, was shot in the head at point-blank range by Garfield Brown after being accosted by a group of men (Brown, Darren Lee, Mark Taylor and Dean Hoskins) who Sam did not know.  Medina buried evidence showing that the sole eyewitness, Kevin Boatwright, had actually previously identified two other innocent men -- who looked nothing like Sam -- as the perpetrators; and he literally created a second eyewitness, where none existed, by coercing Quentin Hagood, who was intellectually disabled, into falsely claiming that he had seen the shooting and that Sam was the shooter.

2.      Building on the egregious police misconduct, the Queens County trial prosecutor concealed exculpatory evidence that would have undermined the identification evidence -- which was the *only* evidence against Sam at trial; knowingly made materially false and misleading statements to the jury bolstering Boatwright's identification; and suborned perjury from Hagood.  The prosecutor's actions were born of a culture of misconduct -- rampant in the Queens District Attorney's Office of the early 1990s as a

2

product of its training and supervision policies -- which have, to date, resulted in the vacatur of more than *forty* criminal convictions for similar ethical breaches.  As a result, Sam was convicted of a murder he did not commit, and spent a quarter of a century in prison, watching from behind bars as his life slowly faded away -- his fiancée left, his mother died, and his toddler grew into a man without a father by his side.

3.      In July of 2020, after he had served 25 years behind bars, Sam's conviction was vacated in state court, with his innocence conclusively acknowledged by both the criminal court that had sentenced him and the District Attorney's office that had prosecuted him.  Thus, the present case involves no question regarding Sam's guilt or innocence. Moreover, egregious police and prosecutorial misconduct -- recognized by both the state court that vacated his conviction and the District Attorney's office that joined in the motion -- was similarly acknowledged and conclusively established, and presents no question in this case.  Indeed, the criminal court, in exonerating Sam, characterized this case as a "grave" and "monumental" "miscarriage of justice," and lamented that the type of conduct at issue in this case leaves "no surprise that large segments of our city and our country have grave doubts about the criminal justice system and its ability to deliver equal and fair justice to all."  To the contrary, "cases like this one demonstrate that their anger is justified and their anger is legitimate."

4.      Sam cannot get back the years of his life that were so wrongfully taken from him by police and other City officials ironically entrusted to protect him and serve the ends of justice.  His life did not matter to them.  He brings the present action to seek monetary compensation for the extraordinary damages he has suffered, as well as exemplary damages

to deter similar misconduct from being committed by the City's law enforcement officers in the future.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as claims in this action arise under 42 U.S.C. § 1983.

6.     This Court may exercise supplemental jurisdiction over the state law causes of action herein.

7.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose.

## MUNICIPAL LAW OBLIGATIONS

8.     Samuel Brownridge timely served a notice of claim on or about September 17, 2020, less than ninety days after his claims accrued.

9.     A 50-H examination was conducted on February 11, 2021, but since this date Mr. Brownridge's claims have not been settled, adjusted, or otherwise withdrawn.

## PARTIES

10.     Plaintiff, Samuel Brownridge, is a resident of the State of Maryland, but at the time of his unlawful arrest and prosecution he resided in Queens County, New York.

11.     Defendant City of New York is a municipal entity in the State of New York, home to the New York City Police Department and the Queens County District Attorney's Office, and was the employer of Defendant Medina and ADA Durant, both of whom were acting in the scope of their employment under color of law at all relevant times.

12.     Defendant Ray Medina was at all relevant times a Detective in the New York City Police Department acting under color of state law.  He is sued here in his personal capacity.

## STATEMENT OF FACTS

### Detective Ray Medina Leads and Corrupts the Darryle Adams Homicide Investigation.

13.     On the night of March 7, 1994, Garfield Brown murdered Darryle "Peanut" Adams in St. Albans, Queens.

14.     When he murdered Darryle Adams, Garfield Brown was accompanied by a man in a wheelchair and two other men.

15.     Garfield Brown murdered Darryle Adams with a .380 caliber gun.

16.     Garfield Brown shot Darryle Adams in the head at point blank range.

17.     The murder of Darryle Adams spurred an investigation by the New York City Police Department (the "Homicide Investigation").

18.     The Homicide Investigation was led by Defendant Medina.

19.     Two days after the shooting, on March 9, 1994, Detective Medina located and interviewed Kevin Boatwright ("Boatwright").

20.     Just before Adams' murder, Boatwright had been separately accosted by the same group, but his life was spared.

21.     Boatwright allegedly claimed that he saw the Adams shooting from a hiding spot behind a car as he was fleeing from the men who had attacked him.

22.     Nevertheless, although he was close with Adams, and claimed to have seen the shooting, he did not call the police at the time of the crime.

23.     Instead, two days after Adams' murder, Boatwright offered a description of the shooter to Defendant Medina that did not resemble Mr. Brownridge.

24.     Boatwright described a shooter in his "mid 20s" with a "short fade" haircut with "shaved … sides," whereas Mr. Brownridge was a teenager with a medium length afro.

25.     Defendant Medina notated Boatwright's description of the shooter in a memo-book.

26.     Defendant Medina's memo-book entry to this effect -- Boatwright's earliest and freshest memory of the shooter -- was withheld from Mr. Brownridge's defense lawyer.

27.     Later, on March 9, 1994, Defendant Medina showed Boatwright two separate photo arrays.  Each one consisted of large, clear, color photographs of six suspects.

28.     Through the photo arrays, Boatwright identified a man named Collin Stewart ("Stewart") as the shooter.

29.     Stewart matched Boatwright's initial description, but looked nothing like Mr. Brownridge.

30.     Immediately below is a photograph of Collin Stewart (on the left) next to a photograph of Mr. Brownridge at the time of his arrest, just days after the shooting (on the right).

6

 

31.     The photograph of Stewart (the "Stewart Photo-Array Picture") is an obvious piece of *Brady* material, given the severity of the contrast from Mr. Brownridge and thus the powerful evidence undermining the credibility of star-witness Boatwright.

32.     Defendant Medina withheld the Stewart Photo-Array Picture from the defense.

33.     Defendant Medina withheld the Stewart Photo-Array Picture from the prosecution.

34.     Defendant Medina failed to draft a police report (or "DD-5") to memorialize the fact that the photo array had taken place at all.

35.     When Stewart was ultimately cleared of wrongdoing, a different detective drafted a DD-5 to note the voiding of Stewart's arrest (the "Arrest-Voiding DD-5").

36.     Defendant Medina withheld the Arrest-Voiding DD-5 from the prosecution and defense.

37.     The jury never got to hear Stewart's name or see his photograph because Defendant Medina buried it.

38.     In fact, no one saw the Stewart Photo-Array Picture for the next 25 years.

39.     The Stewart Photo-Array Picture finally surfaced in 2020, when, at the request of the undersigned firm, the Queens County District Attorney's Office's Conviction Integrity Unit, in the course of reinvestigating this murder, obtained it, along with the DD-5 voiding Stewart's arrest, from Stewart's closed file at police headquarters.

40.     In a separate array, Boatwright identified a man named Dwayne Dunn ("Dunn") as the shooter's accomplice in the wheelchair.

41.     Dunn was subsequently conclusively cleared during the investigation, and similarly does not resemble the actual accomplice, Darren Lee.

42.     When Stewart was ultimately cleared of wrongdoing, a different detective drafted a DD-5 to note the voiding of Dunn's arrest.

43.     Defendant Medina withheld the photograph of Dunn and the accompanying DD-5 voiding Dunn's arrest from both the prosecution and the defense.

44.     The jury never got to hear Dunn's name or see his photograph because Defendant Medina buried it.

45.     The photograph of Dunn from the photo-array did not surface until 2020, when, at the request of the undersigned firm, the Queens County District Attorney's Office's Conviction Integrity Unit, in the course of reinvestigating this murder, obtained it, along with the DD-5 voiding Dunn's arrest, from Dunn's closed file at police headquarters.

46.     On March 13, 1994, Mr. Brownridge's name entered Defendant Medina's investigation through means that Defendant Medina did not document, and did not disclose to the defense.

47.     By March 14, 1994, Defendant Medina knew that Boatwright had misidentified two innocent men.

48.     At this time, Defendant Medina also knew that Mr. Brownridge did not resemble Boatwright's description of the shooter, nor the man that Boatwright had identified from the photo array as the shooter.

49.     Nevertheless, on March 14, 1994, Defendant Medina showed Boatwright a photo-array with Mr. Brownridge's photograph included.

50.     In administering the photo-array, Defendant Medina employed suggestive techniques that the District Attorney's Office has since acknowledged.

51.     Defendant Medina thus prompted Boatwright to identify Samuel Brownridge as the shooter -- a man who Defendant Medina knew looked nothing like the person Boatwright had identified as the shooter less than a week before.

52.     Subsequently, Defendant Medina arrested Samuel Brownridge and placed him in a lineup.

53.     At the lineup, Defendant Medina employed suggestive techniques that the District Attorney's Office has since acknowledged.

54.     Defendant Medina thus prompted Boatwright to identify Samuel Brownridge as the shooter  --  a man who Defendant Medina knew looked nothing like the person Boatwright had identified as the shooter less than a week before.

55.     Defendant Medina then memorialized this identification to maximum effect -- claiming, without acknowledging Boatwright's prior identification of two other innocent men, that his identification of Mr. Brownridge was "immediate[]."

**Detective Medina Extends his Corruption to a Second "Star" Witness.**

56.     Detective Medina's use of improper suggestiveness extended to a second witness, Quintin Hagood ("Hagood").

57.     Hagood was, as the trial prosecutor recognized, "very slow" and "mentally challenged," to the extent that the trial judge openly queried whether to "treat him like a child."

58.     On the night of the murder, Hagood was at a friend's house near the location of the shooting.

59.     Defendant Medina first interviewed Hagood on March 13, 1994.

60.     During Defendant Medina's initial interview of Hagood, Hagood did not claim to have seen the shooting.

61.     Instead, Hagood stated that he saw some men "run pas[t] him after the shooting."

62.     As Medina was aware, and as the District Attorney's Office has now acknowledged, Hagood could not possibly have seen the shooting from his vantage point.

63.     Nevertheless, the following day, on March 14, Detective Medina leveraged Boatwright into influencing Hagood's "memory" of what he observed.

64.     Defendant Medina secured Hagood's appearance at a lineup by having him picked up and driven to the 113th precinct by Boatwright himself.

65.     Once Hagood arrived at the precinct, Defendant Medina pressured Hagood to change his initial statement to now claim that he actually saw the shooting, and to identify Mr. Brownridge as the shooter.

66.     Hagood told Defendant Medina that "it wasn't right and … didn't want to say that Brownridge was the shooter, because [Hagood] did not think he was the shooter," as he subsequently stated under oath.

67.     According to Hagood, "The police told me that Adams' family thought Brownridge was the shooter.  The police told me that Kevin Boatwright knew Brownridge was the shooter.  And the police told me I was the only one who did not think Brownridge was the shooter.  The police wanted me to say he was the shooter.  Kevin Boatwright wanted me to say he was the shooter.  I did not think he was the shooter but they pressured me to identify him."

68.     Succumbing to this pressure, at 10 p.m., Hagood drafted a handwritten statement to Defendant Medina, stating that he had previously lied to police and did not tell them Mr. Brownridge was the shooter, but now claiming that he had actually seen the shooting, and that Mr. Brownridge was involved.

69.     In the statement, Hagood claimed that he saw the shooting while sitting on the stoop of his friend's house -- a claim that the District Attorney's Office has now affirmed was factually impossible, as Medina would have known at the time.

70.     According to a subsequent investigation by the District Attorney's Office, "An examination of the crime scene photos" -- which, of course, Detective Medina would have had -- "demonstrates that Hagood could not have witnessed the shooting from the location where he claimed to have been."

71.     Moreover, though Hagood knew Mr. Brownridge as "Mookie" from High School, in the descriptive portion of this statement Hagood referred to the shooter as the

11

"person" and "man" who pointed a gun, and as the wheelchaired man's "friend," which was inconsistent with a description a person would give of a person he knew by name.

72.    In the last sentence of his statement, Hagood wrote that he "know[s] one of the men involved was Mookie" -- though he still did not say that he *saw* him, or *how* he knew of his involvement -- a critical question to which we now know the answer: he *knew* Mr. Brownridge was the shooter because Defendant Medina told him so.

73.    Within half-an-hour of coercing Hagood's recantation and new inculpatory statement, Detective Medina showed Hagood "one single photograph" -- a picture of Mr. Brownridge.

74.    Showing Hagood a single photograph of Mr. Brownridge was an act of blatant misconduct that Defendant Medina did not disclose to the prosecutor or the defense.

75.    Defendant Medina then had both Boatwright and Hagood view a lineup virtually together:  Boatwright at 10:30pm, and Hagood at 10:31pm.

76.    From this lineup, and under these disturbing circumstances, Boatwright and Hagood both identified Samuel Brownridge -- an act that furnished the *only* probable cause for Brownridge's arrest.

77.    From March 1994 onward into trial, Defendant Medina -- and ultimately the trial prosecutor, Kevin Durant -- continued this overt campaign to pressure Hagood into accusing Mr. Brownridge of murder.

78.    Though Hagood continued to tell both police and prosecutors that he believed Mr. Brownridge was innocent, Durant and Defendant Medina pressured him to testify against Mr. Brownridge, and, according to Hagood, told him that he "would go to jail if [he] didn't testify against [Brownridge]."

79.    Hagood "was young, and … was afraid to go to jail;" so he ultimately relented, and "at trial … testified that [he] saw Brownridge shoot Darryle Adams," but "[t]his was not true."

80.    As Hagood has now explained, "I was afraid that if I did not testify against Brownridge, the police would send me to jail.  I was pressured to testify against Brownridge by the police and the DA, who met with me a few days before the trial and also on the day I testified…."

### The Queens County District Attorney's Office Commits Numerous *Brady* Violations by Withholding Critical Impeachment Evidence from the Defense.

81.    The Queens County District Attorney's Office (the "QCDA") in the 1990s had deeply-flawed training procedures, supervision and customs surrounding the (non) production of *Brady* materials.

82.    In and around the 1990s, training, supervision and discipline surrounding *Brady* was so troubled in the QCDA that more than *twenty* criminal convictions were reversed on account of their failure to disclose material exculpatory information.  *See, e.g. People v. Nelu*, 157 A.D.2d 864 (2d Dept. 1990), *Peoplev. Munoz*, 161 A.D.2d 807 (2d Dept. 1990), *People v. Rivera*, 170 A.D.2d 544 (2d Dept. 1991), *People v. Gaskins*, 171 A.D.2d 272 (2d Dept. 1991), *People v. Delace*, 174 A.D.2d 688 (2d Dept. 1991), *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dept. 1992), *People v. Campbell*, 180 A.D.2d 824 (2d Dept. 1992), *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992), *People v. Banch*, 80 N.Y.2d 610 (1992), *People v. Davis*, 196 A.D.2d 597 (2d Dept. 1993), *People v. Steadman*, 82 N.Y.2d 1 (1993), *People v. Gaines*, 199 A.D.2d 335 (2d Dept. 1993), *People v. Fearnot*, 200 A.D.2d 583 (2d Dept. 1994), *People v. Kirchner*, 200 A.D.2d 766 (2d Dept. 1994), *People v. Baxley*, 84 N.Y.2d 208 (1994), *People v. Moustakis*, 226 A.D.2d 401 (2d Dept.

1996), *People v. May*, 228 A.D.2d 523 (2d Dept. 1996), *People v. Croons*, 231 A.D.2d 585 (2d Dept. 1996), *People v. Huynh*, 232 A.D.2d 655 (2d Dept. 1996), *People v. Ying*, 236 A.D.2d 630 (2d Dept. 1997), *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997), *People v. Burch*, 247 A.D.2d 546 (2d Dept. 1998), *People v. Mackey*, 249 A.D.2d 329 (2d Dept. 1998).[1]

83.     Not limited to *Brady*, the QCDA in and around the 1990s had more than twenty *additional* convictions reversed due, as here, to trial prosecutors presenting false, improper, or materially misleading information to the jury.  *See, e.g., People v. Gunther*, 175 A.D.2d 262 (2d Dept. 1991); *People v. Stevens*, 174 A.D.2d 640 (2d Dept. 1991); *People v. Parker*, 178 A.D.2d 665 (2d Dept. 1991); *People v. Figueroa*, 181 A.D.2d 690 (2d Dept. 1992); *People v. Andre*, 185 A.D.2d 276 (2d Dept. 1992); *People v. Nieves*, 186 A.D.2d 276 (2d Dept. 1992); *People v. Odle*, 187 A.D.2d 536 (2d Dept. 1992); *People v. Robinson*, 191 A.D.2d 595 (2d Dept. 1993); *People v. Hill*, 193 A.D.2d 619 (2d Dept. 1993); *People v. Torres*, 199 A.D.2d 442 (2d Dept. 1993); *People v. Elder*, 207 A.D.2d 498 (2d Dept. 1994); *People v. Montesa*, 211 A.D.2d 648 (2d Dept. 1995); *People v. Moss*, 215 A.D.2d 594 (2d Dept. 1995); *People v. Neuthner*, ,216 A.D.2d 327 (2d Dept. 1995); *People v. Scott*, 217 A.D.2d 564 (2d Dept. 1995); *People v. James*, 218 A.D.2d 709 (2d Dept. 1995); *People v. Torres*, 223 A.D.2d 741 (2d Dept. 1996); *People v. Bonnen*, 236 A.D.2d 479 (2d Dept. 1997); *People v. Walters*, 251 A.D.2d 433 (2d Dept. 1998); *People v. Brown*, 256 A.D.2d 414 (2d Dept. 1998); *People v. Anderson*, 256 A.D.2d 413 (2d Dept.

---

[1] This list was initially compiled by the plaintiff in *Shih Wei Su v. City of New York*, 2006-CV-687 (E.D.N.Y. 2006), who attached the list to his pleadings.  Since the time this list was compiled, Mr. Brownridge, whose conviction suffered from this same type of misconduct that was rampant in QCDA during the 1990s, also had his conviction vacated on the consent of QCDA, as did four additional men -- George Bell, Gary Johnson, and Rohan Bolt.

1998); *People v. Robinson*, 260 A.D.2d 508 (2d Dept. 1999); *People v. Alfaro*, 260 A.D.2d 495 (2d Dept. 1999); *People v. Lewis*, 262 A.D.2d 584 (2d Dept. 1999).[2]

84.     The QCDA's training and supervision failures came to a head in Mr. Brownridge's criminal case, as the QCDA came into possession of some  --  but not all  --  of the material exculpatory evidence possessed by Detective Medina, including Boatwright's two false identifications of men who looked nothing like Samuel Brownridge.

85.     These significantly exculpatory materials  --  Boatwright's photo array identifications of men that did not resemble Brownridge  --  were never disclosed to the defense, in blatant violation of the prosecution's sacred *Brady* obligations.

86.     Assured that defense counsel would not be able to impeach him, trial prosecutor Durant then coached Boatwright to change his description of the shooter in his testimony at trial  --  no longer as a man with a "fade" and "shaved … sides," but now as someone, like Mr. Brownridge, with an "afro."

87.     ADA Durant then falsely presented Boatwright as absolutely positive and unwavering in his identification of Mr. Brownridge, highlighting that he was specially trained as a "watchman" to make accurate observations, knowing all the while that information withheld from the defense proved this picture to be untrue.

88.     ADA Durant employed the same blatantly misleading tactics with regard to Hagood.

89.     Like Detective Medina, ADA Durant knew that it would have been physically impossible for Hagood to have seen the murder from his vantage point.

90.     Yet ADA Durant led Hagood to claim that he saw the shooting.

---

[2] This list was, again, initially compiled by the plaintiff in *Shih Wei Su v. City of New York*.

91.     ADA Durant coached Hagood to respond to any difficulty on cross-examination -- which was abundant -- with a canned response: "I saw what I saw," which Hagood approximated or repeated verbatim at least ten times.

92.     As Durant knew at the time, every one of these statements to the jury was a lie, as Hagood had not *seen* the shooting at all.

93.     Deprived of Hagood's evolving statements that could have been used to impeach him, and of knowledge of the suggestive lineup and coercive tactics employed by the police and prosecutor, the defense had no ability to effectively counter Hagood's false testimony.

**Mr. Brownridge is Falsely Convicted and Spends Twenty-Five Years in Prison.**

94.     Samuel Brownridge was convicted of murder on April 19, 1995.

95.     On April 19, 1995, Mr. Brownridge was 19 years old.

96.     On May 17, 1995, Mr. Brownridge was sentenced to a term of imprisonment of twenty-five years to life.

97.     At sentencing, the trial judge, Acting Supreme Court Justice Robert Hanophy, stated, "It will be my recommendation to the Department of Parole that he serve out the maximum sentence; that is, until he dies."

98.     Mr. Brownridge suffered extraordinary damages in connection with his wrongful conviction.

99.     Mr. Brownridge suffered severe emotional distress, humiliation, deprivation of dignity, loss of liberty, physical injuries, and pecuniary damages.

100.    On June 23, 2020, the defense, prosecution, and Court joined forces in Supreme Court to vacate the conviction of Mr. Brownridge and dismiss his indictment -- acknowledging the stain it represented on the conscience of our criminal justice system.

101.    "[T]his is a double tragedy here today," acknowledged the Queens District Attorney.  "We now know of … your innocence, Mr. Brownridge.  But the actual shooter was identified as a man named Garfield Brown," and he escaped justice.

102.    The Supreme Court Justice presiding at the proceeding was even more moved by Mr. Brownridge's case: "Judges are not supposed to cry in court," Judge Zayas admitted, wiping tears from his eyes.  "I was not a judge when you were convicted in 1995….  Nevertheless, I am the administrative judge of this court now[,] [t]he court in which you were wrongly convicted.  And as the administrative judge I do believe that it is important that I say how sorry we are for the miscarriage of justice, the grave injustice that occurred in this courthouse a quarter of a century ago."

103.    Given the opportunity to address the Supreme Court  himself, Mr. Brownridge began by talking about his mother  --  who had been his champion before and after his conviction, but who did not live to see her son released:  "First, I would like to say thank you to my mother, who is no longer here with us and not able to see me get exonerated today," he said, his voice cracking at the end.  But he continued:

> …I don't think no one who's never been incarcerated knows how it feels to be locked up.  Especially when they are innocent. … I sit down sometimes and I say to myself, why me?  My 20s, my 30s and half of my 40s are gone.  I sit in my jail cell every night waiting for this day while others went home to their families, knowing the system failed….  To many of you this may look like a victory, but as I am before you today I cannot help but see all the loss.

## CAUSES OF ACTION

**FIRST:  MALICIOUS PROSECUTION UNDER 42 U.S.C. §1983
as against Defendant Medina.**

104.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

105.    Defendant Medina was at all times acting under color of state law and in the scope of his employment.

106.    Defendant Medina initiated criminal proceedings against Mr. Brownridge in Queens County, where he was charged with Murder in the Second Degree, Attempted Robbery, Criminal Possession of a Weapon in the Second Degree, and Menacing in the Second Degree.

107.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, the Stewart Photo-Array Picture and the Arrest Voiding DD-5.

108.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, the photo-array photograph of Dunn and the DD-5 voiding his arrest.

109.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, information concerning the suggestive nature of the identification procedures in which Boatwright identified Mr. Brownridge as the shooter.

110.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, information concerning the suggestive nature of the identification procedures in which Hagood identified Mr. Brownridge as the shooter.

18

111.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, his memo book entries containing Boatwright's initial description of the perpetrator, which described a man that did not resemble Mr. Brownridge.

112.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, Hagood's initial rendition denying that he saw the shooting or the shooter and that Sam was innocent.

113.    Defendant Medina advised and encouraged the Queens County District Attorney's Office to prosecute Mr. Brownridge.

114.    Defendant Medina lacked probable cause to believe that Mr. Brownridge was involved in the shooting, knew that he lacked probable cause, and thus fabricated evidence to help secure an indictment and conviction.

115.    The criminal charges against Mr. Brownridge were terminated in his favor as his conviction was vacated on the basis of, *inter alia*, actual innocence, and all charges were dismissed.

116.    Mr. Brownridge's liberty was restrained post-arraignment, including by having to return to criminal court repeatedly pre-trial, at trial, at sentencing, and then being incarcerated for twenty-five years until his release in 2019.

117.    The prosecution was not supported by probable cause that Mr. Brownridge had committed murder or any other charge for which he had been arraigned.

118.    The indictment of Mr. Brownridge was secured through perjury and fraud committed by Defendant Medina and ADA Durant, who suborned false and materially incomplete statements in the grand jury from Boatwright and Hagood, and who withheld

material exculpatory information from the grand jurors' review, including, *inter alia*, the existence and severity of Boatwright's prior two false identifications, the suggestiveness associated with Boatwright's false identification of Mr. Brownridge, the physical impossibility of Hagood's testimony, and the coercion that led to Hagood's testimony.

119.   Defendant Medina acted during all relevant times with actual malice -- prosecuting Mr. Brownridge without probable cause, without the pursuit of justice, and instead to serve alternative goals including, but not limited to, securing a homicide conviction.

120.   Mr. Brownridge suffered substantial damage from the malicious prosecution as set forth above, including, but not limited to, spending twenty-five years in prison for a crime he did not commit.

## SECOND:  MALICIOUS PROSECUTION UNDER STATE LAW
### as against Defendant Medina and the City of New York

121.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

122.    Defendant Medina was at all times acting under color of state law and in the scope of his employment.

123.    Defendant Medina initiated criminal proceedings against Mr. Brownridge in Queens County, where he was charged with Murder in the Second Degree, Attempted Robbery, Criminal Possession of a Weapon in the Second Degree, and Menacing in the Second Degree.

124.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, the Stewart Photo-Array Picture and the Arrest Voiding DD-5.

125.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, the photo-array photograph of Dunn and the DD-5 voiding his arrest.

126.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, information concerning the suggestive nature of the identification procedures in which Boatwright identified Mr. Brownridge as the shooter.

127.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, information concerning the suggestive nature of the identification procedures in which Hagood identified Mr. Brownridge as the shooter.

128.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, his memo book entries containing Boatwright's

initial description of the perpetrator, which described a man that did not resemble Mr. Brownridge.

129.    Defendant Medina withheld material exculpatory evidence from the defense and ADA Durant, including, *inter alia*, Hagood's initial rendition denying that he saw the shooting or the shooter and that Sam was innocent.

130.    Defendant Medina advised and encouraged the Queens County District Attorney's Office to prosecute Mr. Brownridge.

131.    Defendant Medina lacked probable cause to believe that Mr. Brownridge was involved in the shooting, knew that he lacked probable cause, and thus fabricated evidence to help secure an indictment and conviction.

132.    The criminal charges against Mr. Brownridge were terminated in his favor as his conviction was vacated on the basis of actual innocence and all charges were dismissed.

133.    Mr. Brownridge's liberty was restrained post-arraignment, including by having to return to criminal court repeatedly pre-trial, at trial, at sentencing, and then being incarcerated for twenty-five years until his release in 2019.

134.    The prosecution was not supported by probable cause that Mr. Brownridge had committed murder or any other charge for which he had been arraigned.

135.    The indictment of Mr. Brownridge was secured through perjury and fraud committed by Defendant Medina and ADA Durant, who suborned false and materially incomplete statements in the grand jury from Boatwright and Hagood, and who withheld material exculpatory information from the grand jurors' review, including, *inter alia*, the existence and severity of Boatwright's prior two false identifications, the suggestiveness

associated with Boatwright's false identification of Mr. Brownridge, the physical impossibility of Hagood's testimony, and the coercion that led to Hagood's testimony.

136.    Defendant Medina acted during all relevant times with actual malice -- prosecuting Mr. Brownridge without probable cause, without the pursuit of justice, and instead to serve alternative goals including, but not limited to, securing a homicide conviction.

137.    The City of New York is liable for the malicious prosecution of Mr. Brownridge under a theory of *respondeat superior*, as at all times Defendant Medina was acting within the scope of his employment, for the City's benefit and under its control.

138.    Mr. Brownridge suffered substantial damage from the malicious prosecution as set forth above, including, but not limited to, spending twenty-five years in prison for a crime he did not commit.

## THIRD:  FALSE ARREST UNDER 42 U.S.C. §1983
## as against Defendant Medina

139.     Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

140.     Defendant Medina intended to arrest Plaintiff and caused him to be confined.

141.     Plaintiff was aware of his confinement and did not consent to it.

142.     The arrest and confinement of Plaintiff was not supported by probable cause.

143.     The arrest and confinement of Plaintiff was not otherwise privileged.

144.     The indictment of Mr. Brownridge was secured through perjury and fraud committed by Defendant Medina and ADA Durant, who suborned false and materially incomplete statements in the grand jury from Boatwright and Hagood, and who withheld material exculpatory information from the grand jurors' review, including, *inter alia*, the existence and severity of Boatwright's prior two false identifications, the suggestiveness associated with Boatwright's false identification of Mr. Brownridge, the physical impossibility of Hagood's testimony, and the coercion that led to Hagood's testimony.

145.     Plaintiff suffered substantial damage from the false arrest as set forth below.

### FOURTH:  FALSE ARREST UNDER STATE LAW
### as against Defendant Medina and the City of New York

146.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

147.    Defendant Medina intended to arrest Plaintiff and caused him to be confined.

148.    Plaintiff was aware of his confinement and did not consent to it.

149.    The arrest and confinement of Plaintiff was not supported by probable cause.

150.    The arrest and confinement of Plaintiff was not otherwise privileged.

151.    The indictment of Mr. Brownridge was secured through perjury and fraud committed by Defendant Medina and ADA Durant, who suborned false and materially incomplete statements in the grand jury from Boatwright and Hagood, and who withheld material exculpatory information from the grand jurors' review, including, *inter alia*, the existence and severity of Boatwright's prior two false identifications, the suggestiveness associated with Boatwright's false identification of Mr. Brownridge, the physical impossibility of Hagood's testimony, and the coercion that led to Hagood's testimony.

152.    The City of New York is liable for the false arrest of Mr. Brownridge under a theory of respondeat superior, as at all times Defendant Medina was acting within the scope of his employment, for the City's benefit and under its control

153.    Plaintiff suffered substantial damage from the false arrest as set forth below.

## FIFTH:  FABRICATION OF EVIDENCE UNDER 42 U.S.C. §1983
### as against Defendant Medina

154.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

155.    Defendant Medina was an investigating official in connection with the Homicide Investigation.

156.    Defendant Medina fabricated information in connection with the Homicide Investigation -- including, *inter alia*, procuring Boatwright's false identification of Mr. Brownridge through unduly suggestive photo array techniques; claiming that Boatwright's identification of Mr. Brownridge was "immediate" even though, in reality, it came subsequent to his identification of a different man, Stewart, who looked nothing like Mr. Brownridge; and procuring testimony from Hagood that he knew to be false, including claims about seeing the murder that were physically impossible from where Hagood was situated, and allegations inculpatory against Mr. Brownridge that Hagood himself told him were untrue.

157.    The information that Defendant Medina fabricated, including the inculpatory evidence from Boatwright and Hagood, was likely to (and did) influence the jury's verdict.

158.    Defendant Medina forwarded the fabricated evidence to ADA Durant.

159.    Mr. Brownridge suffered a deprivation of liberty as a consequence of Defendant Medina's evidence-fabrication, including, but not limited to, spending twenty-five years in prison for a crime he did not commit.

## SIXTH:  *MONELL* LIABILITY
### as against Defendant City of New York

160.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

161.    Plaintiff's constitutional rights were violated by an official policy and custom of the City of New York through the illegal official policies and customs of the Queens County District Attorney's Office.

162.    The Queens County District Attorney's Office in the 1990s had an official policy and custom of failing adequately to train and supervise its Assistant District Attorneys on the due process rules of *Brady* and its progeny.

163.    The Queens County District Attorney's Office in the 1990s had an official policy and custom of failing adequately to supervise and discipline its Assistant District Attorneys to prevent misconduct, including, but not limited to, violations of *Brady* and its progeny.

164.    The Queens County District Attorney's Office in the 1990s had an official policy and custom of failing adequately to train its Assistant District Attorneys on the due process rules against presenting false, improper, or materially misleading information to the jury.

165.    The Queens County District Attorney's Office in the 1990s had an official policy and custom of failing adequately to supervise and discipline its Assistant District Attorneys to prevent misconduct, including, but not limited to, presenting false, improper, or materially misleading information to the jury.

166.    The Queens County District Attorney's Office in the 1990s had an official policy and custom of failing to adequately discipline prosecutors accused of depriving City residents of their constitutional rights.

167.    The illegal policies of the Queens County District Attorney's Office in the 1990s has led to dozens of criminal convictions being reversed due to *Brady* violations or because of the presentation of false, improper or materially misleading information to the jury.

168.    The illegal policies and customs of the Queens County District Attorney's Office gave rise to the misconduct perpetrated here by ADA Durant, including his violations of *Brady,* and his knowing presentations of false, improper, and materially misleading information to the jury.

169.    The illegal policies created an environment in the Queens County District Attorney's Office that convinced line prosecutors and their supervisors that they could engage in illegal and over-aggressive prosecutorial tactics with impunity.

170.    The illegal policies created an environment in the Queens County District Attorney's Office that led directly to the *Brady* and other violations in this case, including the withholding of evidence from the defense and grand jury that one of the prosecution's star witnesses had made two false identifications before identifying Plaintiff as the shooter; that another star witness had been coerced into testifying against Plaintiff; that the identification procedures used with both star witnesses were unduly suggestive; and that the narrative presented at trial  --  of one witness being unwavering and the other being too intellectually compromised to lie  --  was completely and knowingly false.

171.    At all relevant times ADA Durant was acting as a local county officer in the scope of his employment with the City of New York.

172.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys would regularly confront circumstances in which they would have to make determinations as to whether material in their possession should be disclosed pursuant to *Brady* and its progeny.

173.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys would regularly confront circumstances in which they would have to identify, and know not to cross, the line between being a zealous advocate for the People and the knowing presentation of false, improper or materially misleading information to the jury.

174.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys would regularly confront circumstances in which the scope of their *Brady* obligations would require a difficult decision of the sort that proper training would make less difficult.

175.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys would regularly confront circumstances in which they would have to identify the line between being a zealous advocate for the People and the knowing presentation of false, improper or materially misleading information to the jury -- an exercise of the sort that proper training and supervision would make less difficult.

176.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys who violate their *Brady* obligations would violate the due process rights of men and women facing criminal charges.

177.    Policymakers in the City of New York knew at all relevant times to a moral certainty that Assistant District Attorneys who knowingly present false, improper or materially misleading information to the jury would violate the due process rights of men and women facing criminal charges.

178.    ADA Durant violated *Brady* by, among other things, withholding evidence that Boatwright had given two prior false identifications before identifying Mr. Brownridge as Darryle Adams's murderer.

179.    ADA Durant violated *Brady* by, among other things, withholding evidence that, prior to identifying Brownridge, Boatwright had identified a man as the shooter who matched his initial description of the shooter, and looked nothing like Mr. Brownridge.

180.    ADA Durant violated *Brady* by, among other things, withholding evidence that Hagood could not possibly have observed Darryle Adams's murder from where he was situated at the time of the shooting.

181.    ADA Durant violated *Brady* by, among other things, withhold evidence that Hagood had been coerced into testifying against Mr. Brownridge.

182.    ADA Durant violated his due process obligations by, among other things, presenting false information that Hagood had seen the murder while knowing that such an observation was impossible from where Hagood had been situated at the time of the shooting.

183.    ADA Durant violated his due process obligations by, among other things, presenting false information that Hagood was too intellectually compromised to be dishonest, while knowing that Hagood had already admitted to telling a lie to law enforcement.

184.    ADA Durant violated his due process obligations by, among other things, presenting Boatwright as a witness who was unwavering in his identification of Plaintiff as the shooter while knowing that, in fact, Boatwright had identified a different man as the shooter before ever identifying the Plaintiff.

185.    Plaintiff suffered substantial damage from the *Brady* and other due process violations occasioned by the official polices and customs as set forth above, including, but not limited to, spending twenty-five years in prison for a murder he did not commit.

## DAMAGES

186.    Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

187.    As a consequence of the Defendants' conduct, Plaintiff suffered substantial damages, including loss of liberty, emotional distress, damage to his reputation, pecuniary damages, and attorneys' fees.

188.    The Defendants should be held liable not only to compensate Samuel Brownridge for his damages, but also to pay exemplary damages large enough to dissuade such egregious misconduct from taking place again in the future.

189.    The Defendants should be liable to pay attorneys' fees associated with this action as per the terms of 42 U.S.C. §1988(b).

[Please turn to next page.]

**WHEREFORE**, Plaintiff prays for relief as follows:

A.    That the Court award compensatory damages to Plaintiff and against the defendants jointly and severally, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial that will deter such conduct by defendants in the future;

C.    That the Court award attorney's fees pursuant to 42 U.S.C. § 1988;

D.    For a trial by jury;

E.    For a pre-judgment and post-judgment interest and recovery of their costs; and

F.    For any and all other relief to which they may be entitled.

Dated:  Garden City, New York
        August 15, 2021

**BARKET EPSTEIN KEARON**
**ALDEA & LOTURCO, LLP**

By:    _____

Bruce Barket, Esq.
Donna Aldea, Esq.
Seymour James, Esq.
Aida Leisenring, Esq.
Alexander Klein, Esq.